# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAMUEL ROBERT GOODWIN<br>1711 Massachusetts Ave. NW<br>Unit 807<br>Washington DC 20036<br><br>Plaintiff,<br><br>v.<br><br>THE SYRIAN ARAB REPUBLIC<br>c/o Foreign Minister Faisal al-Mekdad<br>Ministry of Foreign Affairs<br>Next to al-Assad University Hospital<br>Next to Presidency of the Council of<br>Minister Building<br>Kafar Sousa, Damascus, Syria<br><br>Defendant. | Civil Action No.: |

## COMPLAINT

Plaintiff Samuel Robert Goodwin brings this action against Defendant the Syrian Arab Republic ("Syria") and alleges as follows:

### INTRODUCTION

1.  Goodwin is a U.S. citizen who was held captive by the Syrian Arab Republic ("Syria") for 63 days between May and July 2019. During his detention, officials, employees, or agents of Syria, acting within the scope of their office, employment, or agency, tortured Goodwin by subjecting him to inhuman treatment and causing him severe physical and emotional distress. Goodwin brings this action under the Foreign Sovereign Immunities Act's "state sponsor of terrorism" exception to immunity, 28 U.S.C. § 1605A, and seeks compensatory damages for the

assault and battery, intentional infliction of emotional distress, and false imprisonment caused by Syria's acts of torture. Goodwin also seeks punitive damages.

## PARTIES

2. Plaintiff Sam Goodwin is a 34-year-old U.S. citizen. During the events described in the Complaint, he was 30 years old. He was born in Summit, New Jersey, and he resides in Washington, D.C.

3. The State Department designated Defendant Syria Arab Republic a state sponsor of terrorism on December 29, 1979, and Syria has remained so designated since. *See* Revision of Foreign Policy Controls on Exports to Syria, Iraq, Libya, and the People's Democratic Republic of Yemen, 45 Fed. Reg. 33,950, 33,956 (May 21, 1980) (codified 15 C.F.R. Part 385); *State Sponsors of Terrorism*, U.S. Dep't of State Bureau of Counterterrorism, https://www.state.gov/state-sponsors-of-terrorism/ (last visited Jan. 26, 2023); *Sotloff v. Syrian Arab Republic*, No. 16-725 (TJK), 2021 U.S. Dist. LEXIS 47625, at *19 (D.D.C. Mar. 15, 2021) ("The State Department designated Syria a state sponsor of terrorism on December 29, 1979, and Syria has remained so designated since."); *see also* Anti-terrorism: Syria, 15 C.F.R. § 742.9(a)(2) (2013) ("The Secretary of State has designated Syria as a country whose government has repeatedly provided support for acts of international terrorism.").

## JURIDICTION AND VENUE

4. This Court has subject matter jurisdiction over Goodwin's action and personal jurisdiction over Syria pursuant to 28 U.S.C. §§ 1330 and 1605A, which provide for jurisdiction over all civil actions for personal injury of a national of the United States caused by acts of torture carried out by state sponsors of terrorism and their officials, employees, and agents.

5. Goodwin has afforded the Syrian Arab Republic a reasonable opportunity to arbitrate the claims in this action as required under 28 U.S.C. § 1605A(a). Goodwin has made an offer to arbitrate in accordance with accepted international rules of arbitration contemporaneous with this Complaint.

6. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(f)(4).

## FACTUAL ALLEGATIONS

7. In May 2019, Goodwin met a musician who explained that she had recently performed in northeastern Syria. After Goodwin expressed an interest in visiting Syria, she suggested that Goodwin speak with an Iraqi journalist who had helped her get permission to enter Kurdish-controlled northeastern Syria.

8. In late May-2019, Goodwin met the journalist who helped facilitate Goodwin's entry into northeast Syria.

9. When Goodwin entered Syria, he entered an area controlled by Syrian government forces, and was taken captive by Syrian government forces.

10. The questions began immediately after he was captured. His captors wanted to know who he and why he was there. He truthfully explained he was a tourist, but no matter what he said, his Syrian captors had already determined that they were going to falsely accuse him of crimes that would justify shipping him to Damascus.

11. On his first night in custody, Goodwin was taken to a filthy small cell in Qamishli, Syria. There were bullet holes in the walls, and a very large meat hook dangled from the ceiling. The imagery was stark. The room impressed upon Goodwin that his life was no longer in his own hands.

12. He received no information about his status or what his captors planned to do with him. He was left with his own thoughts and the uncertainty of the situation.

13. The following day, Goodwin was brought to a Syrian Military Intelligence prison in Damascus known by the cryptic moniker "Branch 215." Branch 215 is well known as a haven for torture of opponents to the Syrian government.

14. The U.S. Government, non-governmental organizations, and journalists have consistently branded Branch 215 as a hotbed for torture and killings by Syrian government forces. *See The Syrian Holocaust: Branch 215*, Syrian Network for Human Rights, https://snhr.org/blog/2014/09/13/1647/ (issuing report "due to the unimaginable-horrible testimonies and pictures sent to us from the branch 215," and noting "branch 215 . . . has alone more than 7,500 detainee[s] [who] experience daily the most brutal and horrible torture"); *If the Dead Could Speak Mass Deaths and Torture in Syria's Detention Facilities*, Human Rights Watch (Dec. 16, 2015), https://www.hrw.org/report/2015/12/16/if-dead-could-speak/mass-deaths-and-torture-syrias-detention-facilities (highlighting 3,532 victims from Branch 215 alone, and noting that many former detainees call it the "Branch of Death"); Press Release, U.S. Dep't of Treas., *Treasury Sanctions Syrian Regime Prisons, Officials, and Syrian Armed Group* (July 28, 2021), https://home.treasury.gov/news/press-releases/jy0292 (sanctioning 8 prisons including branch 215 for violations of human rights, including torture).

15. Goodwin was subjected to inhuman conditions immediately. He was initially forced into a concrete cell in the dark and dank basement of the prison, which at times was extremely cold. There was no window, a bed, or even a toilet. The small cell had an artificial light that stayed on permanently and interfered with his sleep. Vermin and cockroaches infested his cell. He had no mattress or pillow, and slept on a blanket on the floor. He lived in the same set of

clothes he wore when he was abducted. The conditions in his cell, in combination with changing temperatures throughout the day and night, made it difficult to sleep.

16. Goodwin was fed only bread, boiled potatoes, and water. As a result, he quickly lost around 15 pounds in the two months he was in captivity. At one point in custody, he became ill and suffered bouts of diarrhea.

17. The mental anguish of solitary confinement took its toll on Goodwin's mental health. The only consistent human interaction he had was for a few seconds in the morning and evening when the guards brought him his meals.

18. He also struggled to track the passage of time. Not knowing whether it was day or night was disorienting, and greatly contributed to Goodwin's emotion distress.

19. Every few days, he was permitted to attempt to bath in a dirty, rat-infested room where a broken pipe dropped a trickle of water overhead. These "showering" opportunities were allowed for just 5 minutes each time.

20. In order to use the bathroom, which was just a hole in the concrete floor, he had to ask repeatedly. His requests were not always granted, and sometimes long delays occurred before he was allowed to use the hole in the floor outside his cell. He was brought there and back in a matter of 5 minutes or less. The smell was horrific.

21. Goodwin interacted with others for just minutes a day. These interactions were often intimidating, stressful, and dehumanizing. He was never given any information about his circumstances, why he was being held, or what would happen next.

22. Later, he was forced to move to a smaller cell in the basement that measured about 8 ft. by 10 ft.

23. The cell was smaller, but more of the same: one light that was always on, and an open-air toilet in the room that continuously emitted fetid odors. The walls of his cell were covered in graffiti, likely from prior prisoners, and he also observed what appeared to be dried blood on the walls.

24. From his cell, he heard terrifying sounds. He repeatedly heard other prisoners being tortured. The sounds of thuds and screams permeated his cell and created long lasting fear. He heard crying all night, and was occasionally woken up by the sounds of fights and beatings. Other prisoners were distraught, sometimes injured from beatings, unkempt, weathered, and skinny.

25. Syrian authorities knew Goodwin could hear all of the torture happening around him in neighboring cells. Goodwin believes this was done on purpose and as a scare tactic.

26. After weeks of listening to the screams of other prisoners, including women and children, being interrogated and tortured, Goodwin was forced out of his cell in the middle of the night, blindfolded, handcuffed behind his back, and forced to a room for prolonged intimidating interrogation.

27. Goodwin's captors created fear and anxiety in him in an attempt to obtain information from him. One captor, who spoke English, was his principal interrogator with many others in the interrogation room speaking in Arabic and interacting with his primary interrogator, oftentimes in an agitated and hostile way.

28. He was accused of being a spy, and repeatedly denied that he was. His denials led to increased frustration and aggression from his captors. Goodwin's wrists and shoulders hurt from the handcuffs and from being held in the same position for hours at a time. His requests to loosen the handcuffs to reduce the pain were repeatedly denied.

29. He was returned to his cell briefly, only to be brought right back the following morning. Again, he was blindfolded with his hands handcuffed behind his back.

30. During this second interrogation, his interrogator's frustration boiled over. He told Goodwin to stand up, and after an agonizing pause in which Goodwin thought he might be killed, said: "You need to stop lying to me. I can do a 180 with your life. I will hand you over to ISIS right now."

31. Goodwin was terrified almost to the point of being unable to speak, but nevertheless, he again refused to admit that he was a spy or in Syria for some nefarious purpose.

32. He was offered a "choice" to—(1) be turned over to Russian forces (potentially for additional interrogation); be turned over to Syrian international authorities, who would hold him until the U.S. reopened its Syrian embassy (which Goodwin took as something akin to a life sentence); or he could "leave" the prison and try to be smuggled out of the country. Goodwin doubted the last option was sincere, and even if it was, he suspected it could be a ruse to kill him or turn him over to a different organization. He refused to pick.

33. Goodwin felt distress at being forced to make a decision that could determine if he lived or died. He still often thinks about moments like this—where his life hung in the balance—and wonders about what the "other" outcome might have been.

34. The interrogations, the inhuman conditions he was forced to endure, and the sounds of Branch 215 left Goodwin in a state of fear and anxiety.

35. Goodwin was also brought before a Syrian "court" several times. There was no due process in these appearances. He was not given a lawyer and there was no English translation, so he did not understand what took place.

36. After receiving no useful information, his captors transferred him to a Damascus police station, and then to a general prison population in Adra, just northeast of Damascus.

37. To transfer him, Goodwin was brought outside and put into small 8 ft. by 6 ft. cage with 7 or 8 other captives. They remained there in the brutally hot Syrian summer sun for hours, without water or a bathroom. He was then chained together with the other captives and thrown into what seemed to be (and smelled like) a converted meatpacking truck.

38. In the Adra prison, Goodwin was put into a single cell that held 40 other men. There was no privacy at all. He was forced to use a hole in the wall as a toilet, and there was just a bucket for water and cleaning. Like Branch 215, the conditions in Adra prison negatively affected Goodwin's mental state.

39. There, Goodwin met other captives who spoke English. They told him nightmarish stories about the torture and abuse they suffered in Branch 215, and they had the literal scars to prove it.

40. Without any explanation or context, Goodwin was transferred from the Adra prison and sent back to Branch 215. When he arrived, he was put in a cell in the basement, right next to the original one he used to occupy.

41. He was panicked by his newfound knowledge of Branch 215, and he spent the next day in agony and fear, expecting to be physically tortured (or worse), until he was suddenly told that would be released.

42. Goodwin was released on July 26, 2019, with the help of Lebanese diplomats. One of these diplomats explained to him that Syria thought he was a spy.

43. Terrifyingly, Goodwin learned that his Syrian captors never communicated that it was holding him until the Lebanese diplomats intervened.

44. Goodwin continues to experience the effects of his captivity after he was released. For example, his diet in Syrian custody was so poor that he was admitted to the emergency room shortly after returning to the United States, because his body could not process a normal diet. He also continues to suffer from the mental impact of what he experienced. He has symptoms of PTSD, including nightmares, flashbacks, and sleep issues.

## COUNT I

### (Personal Injuries Caused by Torture Under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A(c))

45. Goodwin re-alleges and incorporates by reference the foregoing allegations as if fully set forth herein.

46. Under 28 U.S.C. § 1605A(c), Goodwin has a private, federal right of action against the Syrian Arab Republic for committing acts of torture against him. Section 1605A(c) requires four elements to be satisfied, all of which are met here:

(a) As of December 29, 1979, the Government of the Syrian Arab Republic, has been designated a state sponsor of terrorism by the U.S. Secretary of State. *See State Sponsors of Terrorism*, U.S. Dep't of State Bureau of Counterterrorism, https://www.state.gov/state-sponsors-of-terrorism/.

(b) Goodwin was a U.S. citizen at the time of his imprisonment and torture and was therefore a national of the United States;

(c) The statute requires at 28 U.S.C. § 1605A(a)(2)(iii) that a claimant afford the foreign state a reasonable opportunity to arbitrate the claim if the actions giving rise to the lawsuit occurred in that foreign state. Simultaneously with the filing of the pleadings and the service of the Complaint, Goodwin is providing Syria an Offer to Arbitrate the claim; and

(d) The foregoing allegations amount to "an act of torture . . . engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency." 28 U.S.C. § 1605A(a)(1).

47. The definition of "torture" under Section 1605A, which is derived from Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73, Section 3(b) (codified at 28 U.S.C. § 1350 (note)), includes:

> [A]ny act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

48. Defendant Syria, acting through and in concert with its agents, intentionally subjected Goodwin inhumane confinement, physical and mental abuse, and threats against his life, all with the intent of obtaining a false confession and extracting information from him. These actions constitute torture as defined under the FSIA and TVPA.

49. Defendant Syria, acting through and in concert with its agents, caused Goodwin to suffer extreme mental and physical anguish and pain.

50. Goodwin continues to suffer harm to this day as a result of the treatment he experienced while in Syrian custody.

### **Theories of Recovery Under § 1605A**

#### *Assault and Battery*

51. Goodwin re-alleges and incorporates by reference the foregoing allegations as if fully set forth herein.

52. Defendant Syria, acting through and in concert with its agents, physically assaulted Goodwin and took actions intended to make him believe he would be physically harmed.

Defendant also intended harmful or offensive contact with Goodwin without his consent. Defendant's conduct included intentionally threatening Goodwin's life.

53. As described in the foregoing allegations, the officials, agents, and employees of Syria, acting within the scope of their office, employment, or agency, caused Goodwin to suffer extreme mental and physical anguish and pain.

54. Goodwin continues to suffer harm to this day as a result of the treatment he experienced while in Syrian custody.

55. Defendant Syria is therefore liable to Goodwin for the full amount of his damages, in such sum as they may be hereinafter determined.

### *Intentional Infliction of Emotional Distress*

56. Goodwin re-alleges and incorporates by reference the foregoing allegations as if fully set forth herein.

57. Defendant Syria's imprisonment and torture of Goodwin, as described in the foregoing allegations, violated acceptable norms of treatment under both U.S. and international law and was intentional and, reckless, extreme and outrageous. As fully described in the foregoing allegations, Syria threatened Goodwin with bodily harm, physically abused him, and subjected him to inhumane living conditions and psychological trauma.

58. As described in the foregoing allegations, the officials, agents, and employees of Syria, acting within the scope of their office, employment, or agency, caused Goodwin to suffer extreme mental and physical anguish and pain.

59. Goodwin continues to suffer harm to this day as a result of the treatment he experienced while in the custody of Syria.

60. Defendant Syria is therefore liable to Goodwin for the full amount of his damages, in such sum as they may be hereinafter determined.

### *False Imprisonment*

61. Goodwin re-alleges and incorporates by reference the foregoing allegations as if fully set forth herein.

62. Defendant Syria, acting through and in concert with its agents, deprived Goodwin of liberty without cause and without legal justification. Defendant held Goodwin in detention even though there was no basis to do so.

63. As described in the foregoing allegations, the officials, agents, and employees of Syria, acting within the scope of their office, employment, or agency, caused Goodwin to suffer extreme mental and physical anguish and pain.

64. Goodwin continues to suffer harm to this day as a result of the treatment he experienced while in the custody of the Defendant Syria.

65. Defendant Syria is therefore liable to Goodwin for the full amount of his damages, in such sum as they may be hereinafter determined.

### *Punitive Damages*

66. Defendant Syria's conduct was criminal in nature, deliberate, willful, wanton, malicious, and in violation of fundamental norms of international law protecting human rights and civilians in conflict.

67. Under 28 U.S.C. § 1605A(c), an award of punitive damages should be imposed against Defendant Syria in an amount to be determined at trial.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court:

A.  Enter judgment against Defendant the Syrian Arab Republic in favor of Plaintiff for compensatory damages, including for economic damages and pain and suffering.

B.  Enter judgment against Defendant the Syrian Arab Republic in favor of Plaintiff for punitive damages.

C.  Award reasonable attorney's fees and costs, including expert fees and interest.

D.  Provide any other further relief the Court deems just and proper.

Dated: January 31, 2023                    Respectfully submitted,

/s/ *Kirby D. Behre*
Kirby D. Behre (D.C. Bar # 398461)
Cody F. Marden (D.C. Bar #1631944)
Miller & Chevalier Chartered
900 16th Street, NW
Washington, D.C. 20006
Tel:   (202) 626-5800
Fax:   (202) 626-5801
Email: kbehre@milchev.com
Email: cmarden@milchev.com