UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAMUEL ROBERT GOODWIN,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>THE SYRIAN ARAB REPUBLIC,<br><br>　　　　Defendant. | Civil Action No. 23-267 (CKK/GMH) |

**MEMORANDUM OPINION**
(April 8, 2025)

Following a referral from this Court, Magistrate Judge G. Michael Harvey issued a [24] Report and Recommendation (the "Report") on Plaintiff Samuel Goodwin's [21] Motion for Default Judgement against the Syrian Arab Republic ("Syria"). Judge Harvey's Report recommends that—although this Court has personal jurisdiction over Syria—Goodwin's Motion should be denied for lack of subject-matter jurisdiction because Goodwin has not overcome Syria's sovereign immunity to suit under the Foreign Sovereign Immunities Act's terrorism exception.

Goodwin timely filed an [25] Objection to the Report's recommendation as to subject-matter jurisdiction. Although Goodwin contests some of Judge Harvey's reasoning, he principally argues that new evidence not presented to Judge Harvey deprives Syria of its sovereign immunity.

Having reviewed the record, Goodwin's briefing, and the applicable law, the Court concludes that the Report correctly recommended that the record before Judge Harvey was insufficient to establish this Court's subject-matter jurisdiction. But Goodwin's newly proffered evidence compels a different result. On the record as now supplemented, the Court finds that it has subject-matter jurisdiction over this dispute. Accordingly, for the reasons that follow, the Court will **ADOPT IN PART** and **REJECT IN PART** the Report and return this matter to Judge Harvey for a determination of damages.

1

# I. BACKGROUND

### A. Factual Background

The Court relates the facts as presented in the record before Judge Harvey—not as subsequently supplemented. Goodwin is an American citizen who traveled to Syria in 2019. *See* Declaration of Samuel Goodwin, ECF No. 21-5 ("Goodwin Decl.") ¶¶ 1, 5. At that time, Syria was engaged in a civil war. United Nations Report, ECF No. 21-1 at 2–6. But an acquaintance had advised Goodwin that, in her experience, Qamishli—a small Syrian city near Turkey—was safe for international tourists. Goodwin Dec. ¶ 3. That advice was misguided.

Unbeknownst to Goodwin, Syria and rebel forces were battling for control of Qamishli in 2019. Goodwin Decl. ¶ 5. And shortly after Goodwin arrived in Qamishli, heavily armed Syrian soldiers accosted him. *Id.* ¶ 7. Guns in hand, those soldiers seized Goodwin's possessions, directed him into a pickup truck, and drove him to a military office. *Id.* ¶¶ 8, 10.

At the office, Goodwin endured hours of questioning. Goodwin Decl. ¶ 11. A Syrian interrogator accused Goodwin of being a spy, which "shocked and terrified" Goodwin because he feared he might be executed for espionage. *Id.* ¶ 10. Goodwin denied the accusation, but his interrogator pressed him to answer questions about why he was in Syria repeatedly and "in a threatening manner." *Id.* When Goodwin stuck to his story, he was accused of lying. *Id.* ¶ 11.

Following his interrogation, Goodwin was handcuffed and escorted to a van. Goodwin Decl. ¶ 12. Eventually, Goodwin arrived at a military compound and was placed in a small, dark cell. *Id.* ¶ 13. The cell was horrific. The walls were peppered with bullet holes and blood stains, and a meat hook dangled from the ceiling. *Id.* Goodwin felt certain the cell had been used to torture other detainees. *Id.* The cell was stifling in the Syrian heat. *Id.* ¶ 14. Goodwin's meals were "fetid," and his cell lacked a toilet or bed. *Id.*

After several days, Goodwin was blindfolded, handcuffed, and led away to a Syrian military plane. Goodwin Decl. ¶ 16. No one told Goodwin where he was being taken. *Id.* When Goodwin's blindfold was removed, he found himself in a dark and filthy "dungeon." *Id.* ¶ 17. Goodwin later learned that he was in Syrian Military Intelligence Branch 215 in Damascus. *Id.*

Branch 215 has been labeled the "Branch of Death" by former detainees. Human Rights Watch Report, ECF No. 21-7 at 14. Torture and extrajudicial killings were apparently common at Branch 215. *See id.* at 30–31. Because of those and other human-rights abuses, the United States sanctioned the Syrian officials who ran Branch 215. *See* ECF No. 21-7.

When Goodwin arrived at Branch 215, he "was stripped and subject to a cavity search." Goodwin Decl. ¶ 17. He was then confined alone in a windowless, concrete basement cell. *Id.* ¶ 18. Goodwin's only human contact came when he received his meals, used a filthy communal toilet, and showered under a "broken pipe emitting fetid, brown water." *Id.* His interactions with guards were stress-inducing because they shouted at him, threatened him, and would "grab and shove" him around. *Id.*

Goodwin's captors continued to accuse him of espionage. Goodwin Decl. ¶ 20. But they also began "taunt[ing]" him "by calling" him a member of ISIS, another crime punishable by death. *Id.* ¶ 20. Goodwin's experience in solitary confinement was disorienting and distressing. *Id.* ¶ 21.

About two weeks later, Goodwin was transferred to another, more populated area of Branch 215 where he could hear other prisoners being beaten and tortured in nearby cells. Goodwin Decl. ¶ 23. There, a guard would go cell by cell, torturing each successive prisoner while drawing nearer and nearer to Goodwin. *Id.* ¶ 24. When the torturer finished with the prisoner in the cell next to Goodwin's, he would open the door to Goodwin's cell, step inside, and stare at Goodwin before turning and leaving. *Id.* This experience was terrifying. *Id.* ¶ 25.

After several weeks, Goodwin was brought blindfolded to an interrogation room and seated with his hands cuffed behind his back. Goodwin Decl. ¶ 26. The interrogator continued to insist Goodwin was a spy and would not accept Goodwin's denials. *Id.* ¶ 27. After hours of sustained questioning, Goodwin was given a reprieve, but he could not sleep. *Id.* ¶ 28. The next morning, the interrogation resumed. *Id.* ¶ 29. In a rage, the interrogator threated "to do a 180 with [Goodwin's] life" and "hand [him] over to ISIS." *Id.* Goodwin feared for his life but maintained that he was not a spy. *Id.* After several hours of this, Goodwin was returned to his cell. *Id.*

Three days later, guards forced Goodwin from his cell and made him sign a document in Arabic that he could not understand. Goodwin Decl. ¶ 30. Goodwin feared that his captors were transferring him to ISIS as they had threatened. *Id.* ¶ 31. In fact, Goodwin was being released from Branch 215 and brought to a crowded holding cell in a Damascus police station. *Id.* ¶ 32. Several days later, he was moved to an outdoor cage where he remained for eight hours in the summer sun without water until being loaded onto a truck. *Id.* ¶ 33.

The truck took Goodwin to Adra Prison on the outskirts of Damascus. Goodwin Decl. ¶ 34. He was confined to a crowded cell with about forty other prisoners. *Id.* The cell offered no privacy, and the only toilet was a hole in the ground. *Id.* There, Goodwin spoke to prisoners who had been tortured in Branch 215. *Id.* ¶ 35. And their stories made him fear he would be tortured too. *Id.*

At Adra, Goodwin was forced to attend court hearings where he was afforded no due process and did not understand what was happening. Goodwin Decl. ¶ 37. Eventually, he was shepherded onto a bus and—to his dismay—returned to Branch 215. *Id.* ¶ 38. Goodwin felt certain he was going to be tortured. *Id.* ¶ 38.

Instead, the next day, Goodwin was driven out of Branch 215 by a convoy of SUVs. Goodwin Decl. ¶ 39. He later learned that his escorts were Lebanese special forces. *Id.* After

4

progressing through a checkpoint, Goodwin was informed that he was in Lebanon. *Id.* The convoy then took Goodwin to Beirut, where he reunited with his parents. *Id.* ¶ 40. In total, Goodwin was imprisoned in Syria for sixty-three days. *Id.* ¶ 38.

### B. Procedural History

After returning to the United States, Goodwin filed this suit seeking compensatory and punitive damages against Syria under the terrorism exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A. *See* Compl., ECF No. 1. Because postal services in Syria had been disrupted by the civil war, the Court granted Goodwin leave to serve Syria through diplomatic channels under 28 U.S.C. § 1608(a)(4). *See* ECF No. 5; Min. Order (Mar. 7, 2023).

The Clerk of Court then mailed copies of Goodwin's Complaint, summons, and notice of suit to the Department of State. Certificate of Clerk, ECF No. 9. And the Department of State later confirmed that Syria had been served by diplomatic note through the Embassy of the Czech Republic in Damascus. Return of Service, ECF No. 15.

Syria did not timely answer or respond to Goodwin's Complaint and has never appeared in this matter. On Goodwin's motion, the Clerk of Court declared Syria in default. Entry of Default, ECF No. 18. And Goodwin then moved for default judgment against Syria as to liability and for an award of compensatory and punitive damages. Mot. for Default Judgment, ECF No. 21.

This Court then referred Goodwin's Motion for Default Judgment to Magistrate Judge G. Michael Harvey for a Report and Recommendation under Local Rule of Civil Procedure 72.3(a). Order, ECF No. 22. Judge Harvey then issued his Report recommending that the Court find (1) that it has personal jurisdiction over Syria but (2) that subject-matter jurisdiction is lacking. Report at 11. Goodwin timely filed his Objection to Judge Harvey's Report. And that Objection is ripe for this Court's review.

## II. LEGAL STANDARDS

Following the submission of a report and recommendation, any party may file objections to the proposed findings and recommendations with the district court. Fed. R. Civ. P. 72(b)(3). The district court "must determine *de novo* any part of the magistrate judge's disposition that has been properly objected to." *Id.* But when no objection is lodged, or when an objecting party makes conclusory or general objections, the district court reviews the report and recommendation for clear error only. *Ellis v. Jackson*, 319 F. Supp. 3d 23, 29 (D.D.C. 2018) (TJK). Following such review, the district court may accept, reject, or modify, in whole or in part, the findings and recommendations made therein. 28 U.S.C. § 636(b)(1).

In general, parties may not raise new arguments or issues for the first time in their objection to a report and recommendation; the reviewing court's review is confined to the record and arguments presented to the magistrate judge. *Sciacca v. FBI*, 23 F. Supp. 3d 17, 27 (D.D.C. 2014) (KBJ). But the district court has discretion to "receive further evidence" on review of a magistrate judge's report and recommendation. Fed. R. Civ. P. 72(b)(3). And the district court may "return the matter to the magistrate judge with instructions" in light of that new evidence. *Id.*

Judge Harvey's Report concerns Goodwin's Motion for Default Judgment. Following an entry of default, a plaintiff may apply for default judgment against an absent defendant. Fed. R. Civ. P. 55. To secure a default judgment against a foreign sovereign, a plaintiff must establish his "claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). That evidence must be admissible. *See Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1049 (D.C. Cir. 2014). But sworn affidavits suffice. *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 212 (D.D.C. 2012) (RMU). And as always, a plaintiff must establish both personal and subject-matter jurisdiction. *See Mwani v. Bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005).

6

## III. ANALYSIS

The Court's analysis proceeds in three parts. First, adopting Judge Harvey's recommendation, the Court finds that it has personal jurisdiction over Syria. Second, overruling Goodwin's objection, the Court finds that Judge Harvey correctly concluded that the Court lacks subject-matter jurisdiction on the record presented in the Motion for Default Judgment. Third, exercising its discretion to accept new evidence, the Court concludes that subject-matter jurisdiction lies on the record as now supplemented by Goodwin.

### A. The Court Has Personal Jurisdiction Over Syria.

This Court has personal jurisdiction over a foreign sovereign served with process under 28 U.S.C. § 1608. 28 U.S.C. § 1330(b). In turn, Section 1608 provides for service in four ways: (1) by special arrangement; (2) by international convention; (3) by certified mail to the sovereign's ministry of foreign affairs; and (4) by diplomatic note. 28 U.S.C. § 1608(a). Congress listed these methods in order of preference, meaning plaintiffs must attempt the first before the second, and so on. *Angellino v. Royal Family Al-Saud*, 688 F.3d 771, 773 (D.C. Cir. 2012).

No party objects to the Report's finding that Goodwin served Syria under Section 1608. Goodwin could not serve Syria by special arrangement or international convention because Syria has not entered into any such arrangements or conventions. Report at 9. And Goodwin could not serve Syria by certified mail to its foreign ministry because no mail carriers would deliver to Syria during its civil war. *Id.* Unable to serve Syria by Section 1608's fist three methods, Goodwin then availed himself of the fourth: service by diplomatic note. *Id.* at 10.

The Court discerns no clear error in the Report's finding that Goodwin properly served Syria under 28 U.S.C. § 1608(a)(4) and that personal jurisdiction therefore lies under 28 U.S.C. § 1330(b). Accordingly, the Court will **ADOPT** the Report's finding as to personal jurisdiction.

### B. Subject-Matter Jurisdiction Was Lacking Before Magistrate Judge Harvey.

The Foreign Sovereign Immunities Act "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) (internal quotation marks omitted). Under the FSIA, a foreign state, like Syria, is immune from suit unless the case falls within a statutory exception. 28 U.S.C. § 1604; *see also id.* §§ 1605–1607. Here, Goodwin invokes the FSIA's terrorism exception: 28 U.S.C. § 1605A. Compl. ¶ 5.

To establish subject-matter jurisdiction under the terrorism exception, Goodwin must make four showings. *See Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 14 (D.C. Cir. 2015). First, Goodwin must show Syria was designated a "state sponsor of terrorism at the time [of] the act" giving rise to suit. *Id.* (quoting 28 U.S.C. § 1605A(a)(2)(i)(I)). Second, Goodwin must show that he was "a 'national of the United States' at that time." *Id.* (quoting 28 U.S.C. § 1605A(a)(2)(ii)(I)). Third, Goodwin must show that he has afforded Syria "a reasonable opportunity to arbitrate." *Id.* (quoting 28 U.S.C. § 1605A(a)(2)(iii)). And fourth, Goodwin must show that he seeks monetary damages for "personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, [or] hostage taking." *Id.* (quoting 28 U.S.C. § 1605A(a)(1)).

Considering the issue *de novo* on Goodwin's objection, the Court agrees with the Report's conclusion: Although Goodwin established the first three elements, the record he presented to Judge Harvey failed to establish the fourth.

***State Sponsor of Terrorism.*** The United States has designated Syria a state sponsor of terrorism continuously since 1979, including in 2019, when Goodwin was taken into custody there. *See Estate of Fouty v. Syrian Arab Republic*, 743 F. Supp. 3d 118, 133 (D.D.C. 2024) (RBW). Accordingly, Syria "was designated as a state sponsor of terrorism at the time" the relevant events occurred. 28 U.S.C. § 1605A(a)(2)(A)(i)(I).

***United States National.*** Goodwin established that he was "a national of the United States" during his detention in Syria. 28 U.S.C. § 1605A(a)(2)(ii)(I). Goodwin's Complaint alleges that he is, and always has been, an American citizen. *See* Compl. ¶¶ 1–2. And he substantiated that allegation by sworn affidavit. Goodwin Decl. ¶ 1. That affidavit satisfies Goodwin's burden of production. *See Barry v. Islamic Republic of Iran*, 410 F. Supp. 3d 161, 174 (D.D.C. 2019) (RC).

***Opportunity to Arbitrate.*** Because the tortious conduct at issue "occurred in the foreign state against which the claim is being brought," Goodwin must provide Syria a "reasonable opportunity to arbitrate" his claim. 28 U.S.C. § 1605A(a)(2)(iii). Goodwin did so.

The FSIA "does not require any particular form of offer to arbitrate, simply the extension of a reasonable opportunity." *Warmbier v. Democratic People's Republic of Korea*, 356 F. Supp. 3d 30, 45 (D.D.C. 2018) (BAH) (internal quotation marks omitted). Here, Goodwin included an offer to arbitrate with the summons and complaint served on Syria by diplomatic note. *See* ECF No. 15. The FSIA requires nothing more. *Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121, 135 (D.D.C. 2021) (TJK).

***Act of Torture.*** On the record before Judge Harvey, Goodwin failed to establish that the personal injuries for which he seeks money damages were "caused by an act of torture" within the meaning of the FSIA. *See* 28 U.S.C. § 1605A(a)(1). The FSIA adopts the definition of "torture" provided in the Torture Victim Protection Act (TVPA). *Id.* § 1605A(h)(7). Under the TVPA:

> (1) the term "torture" means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering . . , whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and
>
> (2) mental pain or suffering refers to prolonged mental harm caused by or resulting from—

9

> (A) the intentional infliction or threatened infliction of severe physical pain or suffering;
>
> (B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;
>
> (C) the threat of imminent death; or
>
> (D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

28 U.S.C. § 1350 note (Definitions).

That definition, though lengthy, does not lend itself to ready application. As a result, the U.S. Court of Appeals for the District of Columbia has focused the definition through a bipartite framework. To determine whether an act qualifies as torture under the TVPA—and through it, the FSIA—the Court must assess (1) the severity of the pain and suffering intended and actually inflicted on the victim and (2) the purpose for which such pain and suffering were inflicted. *Price v. Socialist People's Libyan Arab Jamahiriya*, 295 F.3d 82, 92–93 (D.C. Cir. 2002).

As to the severity prong, the D.C. Circuit instructs that the challenged conduct must be "sufficiently extreme and outrageous to warrant the universal condemnation that the term 'torture' both connotes and invokes." *Price*, 295 F.3d at 92. "The more intense, lasting, or heinous the agony" caused by a challenged act, "the more likely it is to be torture." *Id.* at 93. "[T]orture does not automatically result whenever individuals in official custody are subjected even to direct physical assault." *Id.* Rather, the term "torture" is "reserved for extreme, deliberate and unusually cruel practices, for example, sustained systematic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain." *Id.* at 92–93 (quoting S. Exec. Rep. No. 101-30, at 14 (1990)).

The Court agrees with Judge Harvey that the record before him did not establish that Goodwin was physically tortured within the meaning of the FSIA. In his Motion for Default Judgment and supporting affidavits, Goodwin describes Syrian officials confining him to grossly inadequate living facilities, manhandling him, strip-searching him, and handcuffing him. *See* ECF No. 21-1 at 24–27. Those actions are deplorable. And they might, as Goodwin argues, constitute cruel and unusual punishment if undertaken by an American jailer. But they do not rise to the level of extreme and outrageous conduct sufficient to constitute torture in this District.[1]

Likewise, the Court agrees with the Report's assessment that, although a "closer question," the "psychological abuse" described in the record before Judge Harvey did not amount to psychological torture. Report at 17. Mental abuse may constitute torture under the TVPA, but only where such abuse involves the "intentional infliction or threatened infliction of severe physical pain and suffering" or the "threat of imminent death" that results in "prolonged mental harm." 28 U.S.C. § 1350 note. As with physical torture, the Court's touchstone for psychological torture is whether the abuse involved extreme and outrageous conduct. *See Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 234 (D.C. Cir. 2003).

Here, the record before Judge Harvey showed that Goodwin was implicitly, but never directly, threatened with execution and physical abuse. By confining Goodwin in cells where others appeared to have been beaten and killed, Syrian officials made Goodwin fear the same fate. Goodwin Decl. ¶ 13. By falsely accusing Goodwin of being a spy or member of ISIS, Syrian officials made Goodwin fear that he might be executed on that basis. *Id.* ¶¶ 27–29. And by

---

[1] *See, e.g.*, *Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 150–54 (D.D.C. 2017) (ESH) (plaintiff subjected to beatings with batons, assaults with tasers, whippings, stress positions); *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 68–69 (D.D.C. 2015) (ESH) (beatings to the point of unconsciousness, sexual assault, stress positions); *Nikbin v. Islamic Republic of Iran*, 517 F. Supp. 2d 416, 425 (D.D.C. 2007) (JDB) (whippings, hanging upside down, sexual assault with glass bottle); *Azadeh v. Islamic Republic of Iran*, No. 16-cv-1467, 2018 WL 4232913, at *6–11 (D.D.C. Sept. 5, 2018) (KBJ) (beatings, drugging, pushed down a flight of stairs).

torturing other prisoners in Branch 215 jailed near Goodwin and then menacing Goodwin in his cell, Syrian officials made Goodwin fear that he would be tortured as well. *Id.* ¶¶ 23–25.

The Court will not diminish, by any means, the harrowing nature of Goodwin's experience or the sincerity of his fear. But the record before Judge Harvey did not reveal the kind of explicit, direct threats of imminent violence found to constitute psychological torture under the FSIA.[2]

In his Objection, Goodwin offers some argument that the Report was too exacting in its review of the record. *See* Objection at 11–14 ("*Price* does not require specific facts . . . ."). But the D.C. Circuit has stressed that the FSIA and TVPA's "severity requirement is crucial" and that "it is especially important for courts to ensure that foreign states are not stripped of their sovereign immunity unless they have been charged with actual torture." *Price*, 294 F.3d at 92–93. In short, the FSIA requires the exacting review that the Report offers.

But the Court will not spill more ink on this issue. The principal thrust of Goodwin's Objection is that new evidence not before Judge Harvey establishes that he was tortured. As a result, it suffices to say for now that the Court agrees that the record before Judge Harvey did not support a finding of torture and for that reason did not establish subject-matter jurisdiction.

**C. Goodwin's New Evidence Establishes Subject-Matter Jurisdiction.**

When Goodwin filed his Objection to the Report, he also provided a new affidavit elaborating on his experience in Syria. Among other things, Goodwin's new affidavit avers that Syrian officials engaged in two sets of actions that, taken together with the record before Judge Harvey, suffice to establish this Court's subject-matter jurisdiction over Syria. Accordingly, the Court will return this matter to Judge Harvey for an assessment of damages.

---

[2] *E.g.*, *Rezaian v. Islamic Republic of Iran*, 422 F. Supp. 3d 164, 170–77 (D.D.C. 2019) (RJL) (express threats of execution and dismemberment); *Daliberti v. Republic of Iraq*, 146 F. Supp. 2d 19, 22–25 (D.D.C. 2001) (LFO) (threats to "cut[] off his fingers, pull[] out his fingernails, or shock[] him electrically in his testicles"); *Azadeh*, 2018 WL 4232913, at *12 (mock executions, threats of rape).

Goodwin's original affidavit described, briefly, how he "was stripped and subject to a cavity search" when he arrived at Branch 215. Goodwin Decl. ¶ 17. The affidavit attached to Goodwin's Objection provides greater, and more extreme, detail. Goodwin describes being "stripped and anally penetrated" upon arriving at Branch 215. Supplemental Declaration of Samuel Goodwin ("Supp. Goodwin Decl."), ECF No. 25-1, ¶ 6. Goodwin relates that he "was forced into a room by armed guards" who then "forced him to pull down his pants." *Id.* The guards "laughed mockingly" at Goodwin as they "forced [him] to bend over" and "forced [a] stick into [Goodwin's] anus." *Id.* This experience was harrowing. *Id.* In the ensuing weeks, Goodwin was "repeatedly forced" to expose himself to guards in a similar fashion. *Id.* ¶ 7. And Goodwin "feared they [the guards] would rape [him] again throughout [his] time at Branch 215." *Id.*

Goodwin's original affidavit also described his experience being handcuffed and interrogated at Branch 215. Goodwin Decl. ¶¶ 26–27. Again, his supplemental affidavit offers more detail. Goodwin avers that, during his interrogation, he was forced to sit in a "stress position" for "hours" at a time. Supp. Goodwin Decl. ¶ 11. Specifically, Goodwin describes being "forced to sit blindfolded in a chair with [his] hands cuffed behind [his] back" too tightly. *Id.* This position "made [Goodwin's] wrists and shoulders ache in extreme pain" and made it "hard to focus" on his interrogation. *Id.* Goodwin "begged [his] interrogators to loosen the handcuffs, but they refused to do so and seemed to enjoy seeing [him] in pain." *Id.*

This sworn account of events should have been included in Goodwin's original affidavit in support of his motion for default judgment. Attaching a new affidavit with new factual averments to an objection is procedurally improper. *See Sciacca*, 23 F. Supp. 3d at 27. But the Court has discretion to "receive further evidence" when reviewing a report and recommendation. Fed. R. Civ. P. 72(b)(3). And the Court will exercise that discretion here. As the Court previously

13

explained, Goodwin's original affidavit described deplorable, abusive conduct that fell just short of satisfying the FSIA's rigorous standard for torture. Further, Syria—which has never appeared in this matter and almost certainly never will—is not prejudiced by the Court accepting Goodwin's supplemental affidavit at this stage. The alternative course, denying Goodwin's motion without prejudice and restarting briefing from scratch, would be inefficient and hinder the interests of justice. Accordingly, the Court accepts and assesses Goodwin's new affidavit.[3]

In light of this new evidence, the Court concludes that Goodwin has established that he was tortured within the meaning of the TVPA and FSIA. On a motion for default judgment, the Court may accept as true and "rely on uncontroverted factual allegations that are supported by affidavits." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) (RCL). And as many other courts in this District have recognized, sexual assault and the use of painful stress positions during interrogations may rise to the level of extreme and outrageous conduct sufficient to satisfy the FSIA's severity requirement. *See, e.g.*, *Hekmati*, 278 F. Supp. 3d at 150–54 (stress positions); *Moradi*, 77 F. Supp. 3d at 68–69 (sexual assault, stress positions); *Nikbin*, 517 F. Supp. 2d at 425 (sexual assault). Taken together with the many other opprobrious acts in the record before Judge Harvey, Goodwin's new allegations establish that he was tortured by Syrian officials.

Further, Goodwin's allegations and supporting affidavits establish that Syrian officials with "custody or physical control" over him "intentionally inflicted" this torture on him for the purposes of "obtaining . . . a confession," "punishing" Goodwin for refusing to make such a confession, and "intimidating or coercing" Goodwin into falsely confessing. *See* 28 U.S.C. § 1350

---

[3] Goodwin's counsel explains that Goodwin informed him of the facts described in the supplemental affidavit before he filed the motion for default judgment. Objection at 3 n.1. "[I]n an effort to protect [Goodwin's] privacy" and believing the record before Judge Harvey "was already sufficient, counsel did not go into greater detail in the Motion." *Id.* The Court appreciates counsel's candor. But the Court must also advise counsel that chiding Judge Harvey for "mak[ing] no mention" of facts that counsel never put into the record is an unproductive tactic. *Id.* at 4.

14

note. Goodwin describes his captors using sexual assault to "humiliat[e] and embarrass[]" him. Supp. Goodwin Decl. ¶ 6. He describes his interrogators seemingly delighting in "seeing [him] in pain" from a stress position. *Id.* ¶ 11. And this torturous conduct all occurred while Syrian officials were repeatedly and maliciously attempting to compel Goodwin to confess to espionage or membership in ISIS. Goodwin Decl. ¶¶ 10, 26–29.

Because Goodwin's affidavits, as supplemented, satisfy both the D.C. Circuit's "severity" and "purpose" requirements, *see Price*, 294 F.3d at 92, Goodwin has established that he was tortured within the meaning of the TVPA and FSIA. Because Goodwin has also satisfied the state-sponsor-of-terrorism, United-State-national, and opportunity-to-arbitrate requirements, *see* 28 U.S.C. § 1605A(a)(2), Goodwin has established that the FSIA's terrorism exception applies to his personal-injury claim for money damages. Accordingly, Syria does not enjoy sovereign immunity against Goodwin's suit, and the Court has subject-matter jurisdiction over this action.

### IV. CONCLUSION

For the reasons stated, the Court will **ADOPT** the Report's conclusion that personal jurisdiction lies over Syria. Relying on new evidence not before Magistrate Judge Harvey, the Court will **REJECT** the Report's conclusion that subject-matter jurisdiction is lacking. As a result, the Court will "return this matter" to Magistrate Judge Harvey "with instructions" to determine Goodwin's damages. Fed. R. Civ. P. 72(b)(3). An appropriate order accompanies this Memorandum Opinion.

**DATED:** April 8, 2025.



COLLEEN KOLLAR-KOTELLY
United States District Judge