**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **SAMUEL ROBERT GOODWIN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No: 1:23-cv-00267 (CKK/GMH)** |
| | ) | |
| **SYRIAN ARAB REPUBLIC,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

Samuel Robert Goodwin ("Plaintiff") filed this action against the Syrian Arab Republic ("Syria") under the state sponsor of terrorism exception ("terrorism exception") to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A.  In a decision issued on April 8, 2025, Judge Kollar-Kotelly found that Plaintiff had established that Syria, whose officials abducted him shortly after he arrived as a tourist in the small Syrian city of Qamishli, had subjected him to torture during his imprisonment for 63 days in various locations around that country, and thus that the Court had subject-matter jurisdiction over this case.  *See Goodwin v. Syrian Arab Republic*, No. 23-cv-267, 2025 WL 1040847 (D.D.C. Apr. 8, 2025) [hereinafter *Goodwin II*].  What remains, then, is a determination of whether Syria is liable to Plaintiff for damages and, if so, the amount

of those damages.[1]  For the reasons that follow, the undersigned recommends finding that Syria is liable to Plaintiff and awarding him damages in the amount of $20,201,620.

## I.     BACKGROUND

The undersigned assumes familiarity with the facts from both the prior Report and Recommendation in this case, *see Goodwin v. Syrian Arab Republic*, No. 23-cv-267, 2024 WL 5484081 (D.D.C. Dec. 4, 2024) [hereinafter *Goodwin I*], *report and recommendation adopted in part, rejected in part upon presentation of new evidence*, 2025 WL 1040847 (D.D.C. Apr. 8, 2025), and *Goodwin II*.  In short, Plaintiff was abducted by armed Syrian soldiers after he arrived in that country in the spring of 2019.  *Goodwin I*, 2024 WL 5484081, at *1.  He was taken to a military office, questioned for hours, and accused of being a spy.  *Goodwin II*, 2025 WL 1040847, at *1. He was then transported to a military compound, where he was placed in small, dark, stifling cell "peppered with bullet holes and blood stains," with a meat hook hanging from the ceiling.  *Id.* Several days later, he was taken to a "dark and filthy 'dungeon'" that he eventually learned was located in Syrian Military Branch 215 in Damascus, known as the "Branch of Death," a site where torture, extrajudicial killings, and other human-rights abuses were "apparently common."  *Id.* at *2 (quoting ECF No. 21-5, ¶ 17).  When he arrived at Branch 215, he

> "was forced into a room by armed guards" who then "forced him to pull down his pants."  The guards "laughed mockingly" at Goodwin as they "forced [him] to bend over" and "forced [a] stick into [Goodwin's] anus."  This experience was harrowing.  In the ensuing weeks, Goodwin was "repeatedly forced" to expose himself to

---

[1] The most relevant docket entries for the purposes of this Report and Recommendation are Plaintiff's sealed motion for default judgment and its exhibits, ECF No. 20, particularly (1) Plaintiff's proposed findings of fact and conclusions of law, ECF No. 20-3; (2) Plaintiff's declaration, ECF No. 20-7; (3) Plaintiff's mother's declaration, ECF No. 20-8; (4) the psychological evaluation of Plaintiff by Joseph Gorin, Psy.D., ECF No. 20-13; and (5) the earnings loss analysis prepared by Jerome S. Paige, Ph.D., and Subodh Mathur, Ph.D., of TD&P Consulting, ECF No. 20-19, as well as Plaintiff's supplemental declaration, ECF No. 25-1.  Unsealed and redacted versions of those documents (other than the psychological evaluation, which is redacted in full, *see* ECF No. 21-11, and Plaintiff's supplemental declaration, which is publicly available in its entirety) can be found at ECF No. 21-1 (Plaintiff's proposed findings of fact and conclusions of law), ECF No. 21-5 (Plaintiff's declaration), ECF No. 21-6 (Plaintiff's mother's declaration), and ECF No. 21-17 (the earnings loss analysis).  Where possible, the undersigned cites the publicly available version.  Page numbers cited herein are those assigned by the Court's CM/ECF system.

guards in a similar fashion. And Goodwin "feared they [the guards] would rape [him] again throughout [his] time at Branch 215."

*Id.* at *7 (alterations in original) (internal citations omitted) (quoting ECF 25-1, ¶¶ 6–7).

At Branch 215, Plaintiff was held in solitary confinement "in a small cell, was forced to go to the bathroom in a filthy hole and shower in 'fetid, brown water,' and was frequently grabbed and shoved by prison guards." *Goodwin I*, 2024 WL 5484081, at *2 (quoting ECF No. 21-5, ¶ 18). Guards taunted him by calling him a member of ISIS and threatening to turn him over to that organization. *See id.* When he was later moved to a more populated area of the facility, he

> heard the cries and screams from other inmates enduring torture. There, a guard would go cell by cell, beating and torturing each successive prisoner, while the other prisoners heard their screams and cries. After torturing the prisoner in the cell next to Plaintiff, the guard would open his cell door, step into the cell, and stare at Plaintiff before going to torture the next prisoner.

*Id.* (internal citations omitted). Several weeks later, Plaintiff was taken blindfolded to an interrogation room and again accused of being a spy. *See Goodwin II*, 2025 WL 1040847, at *2. During this interrogation

> he was forced to sit in a "stress position" for "hours" at a time. Specifically, Goodwin describes being "forced to sit blindfolded in a chair with [his] hands cuffed behind [his] back" too tightly. This position "made [Goodwin's] wrists and shoulders ache in extreme pain" and made it "hard to focus" on his interrogation. Goodwin "begged [his] interrogators to loosen the handcuffs, but they refused to do so and seemed to enjoy seeing [him] in pain."

*Id.* at *8 (alterations in original) (internal citations omitted) (quoting ECF No. 25-1, ¶ 11). He was interrogated for hours, then "given a reprieve" only to have the questioning resumed the next day by an interrogator who made what Plaintiff understood to be a threat against his life. *Id.* at *2; *see also Goodwin I*, 2024 WL 5484081, at *2.

Three days later, Plaintiff was taken from his cell and forced to sign a document in Arabic that he could not understand. *See Goodwin II*, 2025 WL 1040847, at *2. He was then transferred

3

to a crowded holding cell in a Damascus police station, where he was held for several days before being moved to "an outdoor cage where he remained for eight hours in the summer sun without water until being loaded onto a truck." *Id.* He was taken to a prison on the outskirts of Damascus, where he was confined to a cell with dozens of other prisoners, all of whom had to use a hole in the ground as a toilet. *Id.* During his period at the prison, he "was forced to attend court hearings where he was afforded no due process and did not understand what was happening." *Id.* at *3. Later he was returned to Branch 215, where he "felt certain he was going to be tortured." *Id.* However, the next day he was driven out of Branch 215 by escorts that he later learned were Lebanese special forces. *See id.* They delivered him to Beirut, where he was reunited with his parents. *See id.* He was imprisoned in Syria for a total of 63 days. *See id.*

"Since returning to the United States, Plaintiff has endured the lasting effects of his detention in Syria." *Goodwin I*, 2024 WL 5484081, at *2. ███████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████

Plaintiff filed this action on January 31, 2023, and moved for default judgment in March 2024.  *See* ECF No. 1; ECF No. 21.  Judge Kollar-Kotelly referred the case to the undersigned for a report and recommendation on the motion.  *See* ECF No. 22.  The undersigned issued that Report and Recommendation—*Goodwin I*—in December 2024.  It first found that Plaintiff had established personal jurisdiction over Syria.  *See Goodwin I*, 2024 WL 5484081, at *4–5.  However, Plaintiff had failed to establish subject-matter jurisdiction over his claims.  Plaintiff had met the first three requirements to establish subject matter jurisdiction because he had filed (1) a nonjury civil action, (2) for *in personam* relief, (3) against a foreign state.  *See id.* at *5 (citing 28 U.S.C. § 1330(a)).  However, Plaintiff had failed to clear the fourth and final hurdle, which required him to show that Syria's conduct fell under the terrorism exception to foreign sovereign immunity pursuant to another four-factor test.  *See id.* at *5–6.  Plaintiff had established that (1) Syria was designated a state sponsor of terrorism at the time of the conduct at issue, (2) Plaintiff was a U.S. national at the time of his imprisonment, and (3) Plaintiff provided Syria a reasonable opportunity to arbitrate the claim.  *See id.* at *6; *see* 28 U.S.C. § 1605A(a)(2)(A)(i)(I), (ii)(I), (iii) (setting out those three requirements).  However, Plaintiff had failed to show "that the foreign state committed 'an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act,' resulting in personal injury or death to the plaintiff." *Id.* at *6 (quoting 28 U.S.C. § 1605A(a)(1)).

The undersigned found that although Plaintiff alleged that he was subjected to "deplorable, abusive conduct," he had not shown that his treatment met the "high bar" that the D.C. Circuit has set for torture, "'a label that is "usually reserved for extreme, deliberate and unusually cruel

practices,'" such as, 'sustained, systematic beating, application of electric currents to sensitive

parts of the body and tying up or hanging in positions that cause extreme pain.'" *Id.* at \*7, \*8

(quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 92–93 (D.C. Cir.

2002)).  As for the physical abuse alleged, the undersigned determined that

> subjecting Plaintiff to "small cells, poor hygiene, inconsequential meals, and sleep
> deprivation" during his 63 days of captivity and physical manhandling, including
> shoving, blindfolding, and handcuffing, although deplorable, does not rise to the
> severity of the "unusually cruel practices" like "systematic beating, application of
> electric currents, to sensitive parts of the body and tying up or hanging in positions
> that cause extreme pain" required to find a showing of physical torture within the
> meaning of the [relevant statute].

*Id.* at \*7 (internal citations omitted) (first quoting ECF No. 21-1 at 25–27; and then quoting *Price*,

294 F.3d at 93–94) (citing ECF No. 21-5, ¶¶ 18, 26).  The undersigned found that whether "the

psychological abuse that Plaintiff suffered while detained in Syria amounted to torture" was "a

somewhat closer question."  *Id.* at \*8.  Allegations that "prison guards threaten[ed] to turn Plaintiff

over to ISIS[,] . . . repeatedly stepp[ed] into his cell in a menacing manner after beating prisoners

in adjacent cells," and "implicit[ly] threaten[ing] . . . death or physical abuse . . . 'certainly re-

flect[ed] a bent toward cruelty on the part of [his] perpetrators.'"  *Id.* (final alteration in original)

(quoting *Simpson v. Socialist People's Libya Arab Jamahiriya*, 326 F.3d 230, 234 (D.C. Cir.

2003)).  However, it is akin to conduct the D.C. Circuit has found insufficient to satisfy the severity

requirement of *Price*, like a plaintiff being "held 'captive and incommunicado' for three

months, . . . 'forcibly separated from her husband [and] unable to learn of his welfare or his where-

abouts,' [and] . . . threatened 'with death if she attempted to leave her area of confinement."  *Id.*

(first alteration in original) (quoting *Simpson v. Socialist People's Libya Arab Jamahiriya*, 180 F.

Supp. 3d 78, 88–89 (D.D.C. 2001), *rev'd in part*, 326 F.3d 230 (D.C. Cir. 2003).  Accordingly, the

undersigned found that Plaintiff's allegations did not meet the definition of torture and

recommended denying his motion for default judgment and dismissing his claims for lack of subject matter jurisdiction. *See id.* at *9.

In response to Plaintiff's objections to *Goodwin I*, Judge Kollar-Kotelly adopted the undersigned's conclusions that Plaintiff had established personal jurisdiction over Syria and had met three of the four requirements for subject matter jurisdiction. *See Goodwin II*, 2025 WL 1040847, at *4–5. She also agreed that the "record [Plaintiff] presented to [the undersigned] failed to establish" that Plaintiff had been tortured. *Id.* at *5. His description of "Syrian officials confining him to grossly inadequate living facilities, manhandling him, strip-searching him, and handcuffing him" did not "rise to the level of extreme and outrageous conduct sufficient to constitute torture in this District." *Id.* at *6. Similarly, Plaintiff's allegations of psychological abuse—"confining [him] in cells where others appeared to have been beaten and killed," making him "fear the same fate"; "falsely accusing [him] of being a spy or member of ISIS," making him "fear that he might be executed on that basis"; and "torturing other prisoners in Branch 215 jailed near [him] and then menacing [him] in his cell," making him "fear that he would be tortured as well"—constituted "implicit[], but never direct[], threat[s]" of execution and physical abuse, rather than the "kind of explicit, direct threats of imminent violence found to constitute psychological torture under the FSIA." *Id.* at *7.

However, Plaintiff filed, along with his objections to the Report and Recommendation, a new affidavit "elaborating on his experience in Syria" in two material ways. *Id.* First, whereas the "original affidavit described, briefly, how he 'was stripped and subject to a cavity search' when he arrived at Branch 215," the new affidavit asserted that he was "stripped and anally penetrated" with a stick while being ridiculed by guards and "'repeatedly forced' to expose himself to guards" in the ensuing weeks. *Id.* (first quoting ECF No. 21-5, ¶ 17; and then quoting ECF No. 25-1, ¶¶

6–7). Second, whereas the "original affidavit also described his experience being handcuffed and interrogated at Branch 215," the new affidavit asserted that "for 'hours' at a time" he was "forced to sit in a 'stress position'" in "'a chair with [his] hands cuffed behind [his] back' too tightly," causing him "extreme pain," which his captors appeared to enjoy. *Id.* (alterations in original) (quoting ECF No. 25-1, ¶ 11). Judge Koller-Kotelly found that those new facts—"sexual assault and the use of painful stress positions"—established that Plaintiff's treatment met the definition of torture, when "[t]aken together with the many other opprobrious acts in the record." *Id.* at *8.

And so, Judge Kollar-Kotelly found that Plaintiff had established subject-matter jurisdiction and returned the case back to the undersigned to determine damages. *See id.* at *9.

## II.    LEGAL STANDARD

### A.    Liability Under 28 U.S.C. § 1605A(c)

As relevant here, Section 1605A(c) creates a cause of action for a U.S. national who has suffered personal injury caused by torture at the hands of a state sponsor of terrorism or its agents. *See* 28 U.S.C. § 1605A(c). However, that provision merely creates a general private right of action against a state sponsor of terrorism, it "does not itself provide the 'substantive basis' for claims brought under the FSIA." *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 361 (D.D.C. 2020) (quoting *Maalouf v. Islamic Republic of Iran*, Nos. 16-cv-280, 16-cv-1507, 2020 WL 805726, at *5 (D.D.C. Feb. 18, 2020)). Rather, FSIA plaintiffs are required "to prove a [specific] theory of liability." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 73 (D.D.C. 2010); *see also Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 175–76 (D.D.C. 2010) ("[P]laintiffs in § 1605A actions . . . must articulate the justification for such recovery, generally through the lens of civil tort liability."). To determine if a plaintiff has properly asserted a substantive basis for liability for their claims, the D.C. Circuit "rel[ies] on well-established principles of law, such

as those found in Restatement (Second) of Torts." *See In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009); *see also Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003) (using the Restatement of Torts "as a proxy for state common law" in determining liability under the FSIA).

### B.    Damages

"To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were 'reasonably certain' (i.e., more likely than not) to occur, and must prove the amount of damages by a 'reasonable estimate' consistent with this [Circuit]'s application of the American rule on damages." *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 402 (D.D.C. 2015) (alteration in original) (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005)); *accord Kim v. Democratic People's Republic of Korea*, 87 F. Supp. 3d 286, 289 (D.D.C. 2015).  In determining the "reasonable estimate," courts may look to expert testimony and prior awards for comparable injuries.  *See Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 213–14 (D.D.C. 2012); *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008).

### III.    DISCUSSION

As noted above, before addressing the question of damages, the court must determine whether Plaintiff has established Syria's liability under a viable cause of action.  *See Valore*, 700 F. Supp. 2d at 73.  Here, Plaintiff asserts that Syria is liable for the pain and suffering he endured

during and after his detention, and seeks recovery for alleged battery, assault, false imprisonment, and intentional infliction of emotional distress committed by Syrian officials.  ECF 21-1 at 29, 33.

### A.    Battery

Syria is liable for battery if its officials acted "[(1)] 'intending to cause a harmful or offensive contact with . . . , or an imminent apprehension of such a contact' by, those attacked and (2) 'a harmful contact with' those attacked 'directly or indirectly result[ed].'"  *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 36 (D.D.C. 2012) (second and third alterations in original) (quoting Restatement (Second) of Torts § 13).  Torture is, "by [its] very nature, intended to harm and to terrify by instilling fear of such harm."  *Rezaian v. Islamic Republic of Iran*, 422 F. Supp. 3d 164, 179 (D.D.C. 2019) (quoting *Valore*, 700 F. Supp. 2d at 77).  The Court should find that Syria acted with intent to cause harmful contact and the immediate apprehension thereof.  Like the plaintiff in *Rezaian*, Plaintiff was "forcibly arrested," shoved around the prison, and suffered other physical and indignities at the hands of officials.  *Id.*; ECF No. 21-5, ¶ 8; ECF No. 25-1, ¶¶ 6, 8.  In *Rezaian*, similar "harmful contacts" were sufficient to establish battery, and accordingly Plaintiff has satisfied the elements required to prove that tort.  *See Rezaian*, 422 F. Supp. 3d at 179 (finding that Iranian officials committed of acts of battery when the plaintiff was "forcibly arrested" and "moved [] around" prison); *see also Saberi v. Islamic Republic of Iran*, 541 F. Supp. 3d 67, 82 (D.D.C. 2021) (finding battery when the plaintiff's captors "forced her out of her apartment, strip-searched her, and repeatedly moved her around the prison").

### B.    Assault

Liability for assault requires two conditions: "(1) [the defendants] acted 'intending to cause a harmful contact with . . . , or an imminent apprehension of such a contact' by, those attacked and (2) those attacked were 'thereby put in such imminent apprehension.'"  *Wultz*, 864 F. Supp. 2d at

35 (second alteration in original) (quoting *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 73 (D.D.C. 2010))). "By [its] very nature, torture . . . subject[s] the victim to 'imminent apprehension of harmful or offensive conduct[.]'" *Abedini v. Islamic Republic of Iran*, 422 F. Supp. 3d 118, 132 (D.D.C. 2019) (quoting *Sutherland v. Islamic Republic of Iran*, 151 F. Supp. 2d 27, 48 (D.D.C. 2001)). Courts in this Circuit have found that individuals "who are tortured or threatened 'withst[and] a continuous . . . tortious assault.'" *Id.* (alteration in original) (quoting *Sutherland*, 151 F. Supp. 2d at 48). Here, Defendant Syria through its officials acted with intent to cause an imminent apprehension of harmful contact and put Plaintiff in imminent apprehension. For example, Plaintiff was forced to listen, multiple times as a day, as a guard would start at the end of the hallway in which Plaintiff was detained, beating the prisoners in each successive cell, before stepping into Plaintiff's cell and staring at him. ECF No. 21-1 at 15. This conduct by his captors, hearing "cell doors opening and closing and the ensuing cries and screams from the occupant(s)" and "the torturer get closer," left Plaintiff "in a constant state of apprehension." *Id.* Plaintiff has sufficiently established the tort of assault. *See Saberi*, 541 F. Supp. 3d at 82 (finding assault when captors "routinely threatened [the plaintiff] with death and physical harm.").

## C. False Imprisonment

A party is liable for false imprisonment if its agents: (a) confine a person within boundaries fixed by the agents; (b) the agents' actions result, directly or indirectly, in confining the victim; and (c) the victim is aware of the confinement. Restatement (Second) of Torts § 35 (1965); *see also Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 34 (D.D.C. 2001). For sixty-three days, Syria confined Plaintiff against his will in cells northeastern Syria, in Military Intelligence Branch 215 and Adra Prison. ECF No. 21-1 at 31. Plaintiff was unable to leave these sites during his detention. *Id.* Defendants are therefore liable for false imprisonment. *See Azadeh v. Islamic*

*Republic of Iran*, No. 16-cv-1467, 2018 WL 4232913, at *17 (D.D.C. (finding false imprisonment when the plaintiff was "confined [] against her will in a cell . . . [and] was not permitted to leave").

### D.    Intentional Infliction of Emotional Distress

Syria is liable for intentional infliction of emotional distress if it "by extreme and outrageous conduct[,] intentionally or recklessly cause[d] severe emotional distress to" Plaintiff. Restatement (Second) of Torts, § 46(1) (1965). "Torture, by definition, involves 'extreme and outrageous' conduct." *Abedini*, 422 F. Supp. 3d at 133. Plaintiff was detained for sixty-three days, forced to listen to other prisoners enduring torture and abuse, held in a cell that showed signs of past torture, remained in inhumane, filthy conditions, and was threatened with being handed over to ISIS. ECF No. 21-1 at 31–32; ECF No. 21-5, ¶ 29. ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████ Syria is therefore liable for intentional infliction of emotional distress.

Accordingly, Plaintiff has established the Defendant's liability under Section 1605A(c) for the torts of battery, assault, false imprisonment, and intentional infliction of emotional distress. The only question that remains is the amount of damages to be awarded.

### E.    Plaintiff's Damages

The FSIA's terrorism exception authorizes courts to award plaintiffs "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). Here, Plaintiff seeks compensatory damages for his pain and suffering and lost earnings, as well as punitive damages. *See* ECF No. 21-1 at 32–38.

As noted, "[t]o obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were 'reasonably certain' (i.e.,

more likely than not) to occur, and must prove the amount of damages by a 'reasonable estimate' consistent with this [Circuit]'s application of the American rule on damages." *Roth*, 78 F. Supp. 3d at 402 (alteration in original) (quoting *Salazar*, 370 F. Supp. 2d at 115–16). In determining the "reasonable estimate," courts may look to expert testimony and prior awards for comparable injuries in similar cases. *See Reed*, 845 F. Supp. 2d at 213–14.

Plaintiff has satisfactorily shown that the pain and suffering he experienced in Syrian custody and thereafter were reasonably certain to occur as a result of Syria's conduct. *See Hekmati v. Islamic Republic of Iran*, 278 F. Supp. 3d 145, 163 (D.D.C. 2017) ("Pain and suffering, past and future, are obviously a reasonably certain consequence of torture."). And courts have found that abduction and torture by a foreign state is likely to cause "harm to the mind" resulting in lost earnings. *Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 71 (D.D.C. 2015) (quoting Restatement (Second) of Torts, § 906 (1979)). Accordingly, Plaintiff has proven that "the consequences of the foreign state's conduct were 'reasonably certain' . . . to occur" and the undersigned turns to determining the appropriate amount of damages to be awarded. *Roth*, 78 F. Supp. 3d at 402 (quoting *Salazar*, 370 F. Supp. 2d at 115–16)

1.    Pain and Suffering

As court after court has noted, determining a monetary award to compensate a victim of torture or other mistreatment at the hands of a foreign sovereign is "difficult." *W.A. v. Islamic Republic of Iran*, No. 18-cv-1883, 2020 WL 7869218, at *13 (D.D.C. Mar. 23, 2020) (quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 134 (D.D.C. 2005)), *report and recommendation adopted*, 2020 WL 7869211 (D.D.C. Apr. 11, 2020). Because "there is no market where pain and suffering are bought and sold, nor any standard by which compensation for it can be definitely ascertained," *id.* (quoting *Weinstein v. Islamic Republic of Iran*, 184 F.

Supp. 2d 13, 22 (D.D.C. 2002)), to comply with the mandate "that 'individuals with similar injuries receive similar awards,'" *Hekmati*, 278 F. Supp. 3d at 163 (quoting *Moradi*, 77 F. Supp. 3d at 70)), courts must engage in the macabre exercise of determining whether the suffering endured by one individual subjected to repellent mistreatment by a state sponsor of terror is greater than or less than that endured by another who was also subjected to similar mistreatment. But no matter how distasteful, that is the undersigned's task.

a.    *Pain and Suffering for Period of Captivity in Syria*

A formula of awarding $10,000 per day of captivity has evolved in this District as a general standard for cases of prolonged and abusive unlawful detention brought under the FSIA. *See, e.g.,* *Saberi*, 541 F. Supp. 3d at 82–83 (awarding $1 million in pain and suffering damages for 100 days of captivity); *Rezaian*, 422 F. Supp. 3d at 180 ($5.44 million for 544 days in captivity); *Frost v. Islamic Republic of Iran*, 419 F. Supp. 3d 112, 114–15 (D.D.C. 2020) ($310,000 for 31 days of confinement); *Hekmati*, 278 F. Supp. 3d at 163–64 ($16.02 million for 1,602 days of imprisonment); *Stansell v. Republic of Cuba*, 217 F. Supp. 3d. 320, 346 (D.D.C. 2016) ($19.67 million for 1,967 days held hostage); *Moradi*, 77 F. Supp. 3d at 70 ($1.68 million for 168 days of imprisonment); *Kilburn v. Islamic Republic of Iran*, 699 F. Supp 2d 136, 157 (D.D.C. 2010) ($5.03 million for 503 days held hostage); *Massie v. Democratic People's Republic of Korea*, 592 F. Supp. 2d 57, 77 (D.D.C. 2008) ($3.35 million for 335 days of imprisonment); *Sutherland*, 151 F. Supp. 2d at 51 ($23.54 million for 2,354 days of captivity).

Plaintiff argues that the standard $10,000 per day formula is insufficient and fails to appropriately account for the distinct facts in each FSIA case. ECF No. 20-3 at 34. For example, Plaintiff cites *Cronin v. Islamic Republic of Iran*, in which Judge Lamberth departed from the $10,000 per day formula. ECF No. 21-1 at 34. In *Cronin*, the plaintiff was abducted from the hospital,

where he had gone to seek treatment for a painful and "very serious" bowel obstruction. 238 F. Supp. 2d 222, 226 (D.D.C. 2002), *abrogated on other grounds by Cicippio-Puleo v. Islamic Republic of Iran*, 353 F. 3d 1024 (D.C. Cir. 2004). His abductors repeatedly punched him in the abdomen at the location of the obstruction and kicked and punched him in the face. *See id.* During his four-day captivity, he was "severely beaten numerous times." *Id.* at 227. By the second day, he was unable to sit or stand up on his own; on the third day, he remained "contorted in a sort of fetal position" because he could not straighten up. *Id.* (quoting the record). His condition deteriorated so much that his jailors took him to be examined by a local doctor, who was unable to help. *See id.* On the fourth day, without explanation, he was returned to the hospital "near death." *Id.* at 228. The court chose to abandon the *per diem* approach "[i]n light of the severity of [the] beatings (which were greatly exacerbated by [the] bowel obstruction) and the brevity of confinement." *Id.* at 234.

Other cases that eschew the $10,000 per diem formula have similarly gruesome facts. Plaintiff cites *Acree v. Republic of Iraq*, in which the court awarded between $10 million and $20 million to U.S. service members who were prisoners of war in Iraq for various periods of just under 50 days during the Gulf War and were "violently tortured" with "severe beatings, mock executions, threatened castration, . . . threatened dismemberment," electric shocks, denial of medical care, intentional aggravation of existing injuries, systematic starvation, denial of sleep, and exposure to freezing cold, causing "serious physical injuries" such as "broken bones, perforated eardrums, nerve damage, infections, nausea, severe weight loss, [and] massive bruises," among other injuries. 271 F. Supp. 2d 179, 185, 220 (D.D.C. 2003), *vacated on other grounds*, 370 F.3d 41 (D.C. Cir. 2004). In *W.A.*, the court adopted the undersigned's recommendation rejecting an award of $50,000 in favor of $10 million lump sum for the pain and suffering caused by a five-day captivity

in which the victim "suffered severe physical and psychological torture prior to his murder," including having "holes drilled into his body," being burned, suffering broken bones from severe beatings, and being used to extort money from his family, who were "made to listen to his screams and cries for help as he was tortured."  2020 WL 7869218, at *14.  Similarly, in *Azadeh*, the plaintiff was held in a cell with a "bright blue light" that was never dimmed or turned off; "interrogated every day for . . . six weeks . . . , often for periods of twelve hours or more"; kicked into a wall repeatedly, "bloodying her face and knees"; pushed down a flight of stairs while handcuffed and blindfolded; whipped; threatened with rape; told her fiancé had been arrested and would be tortured; falsely informed that her mother had died; medicated against her will; and twice subjected to mock executions that caused her to lose consciousness.  2018 WL 4232913, at *5–8.  The court adopted the undersigned's recommendation that Plaintiff be awarded $10,000 per day for her 114 days of captivity, plus an additional $1 million for each of the two mock executions.  *See id.* at *1, *18–19.

The conduct from which Plaintiff here suffered, although certainly reprehensible, does not rise to the level of that at issue in *Cronin*, *Acree*, *W.A.*, or *Azadeh*.  It bears repeating that both the undersigned and Judge Kollar-Kotelly found that Plaintiff's original allegations, which included captivity in execrable conditions, manhandling, strip-searching, and psychological abuse that caused him to fear that he would be tortured or killed, did not constitute torture.  *See Goodwin II*, 2025 WL 1040847, at *6–7; *Goodwin* I, 2024 WL 5484081, at *7–8.  The new allegations that ultimately led Judge Kollar-Kotelly to find that Plaintiff had been tortured were that (1) when he arrived at Branch 215, he was stripped and a stick was inserted into his anus—conduct that Plaintiff does not assert was repeated, although he was "repeatedly forced to completely expose [him]self to the guards," ECF No. 25-1, ¶ 7; and (2) after being held at Branch 215 for several weeks, he

was interrogated for hours while in a stress position, causing severe pain—conduct that it appears may have been repeated when he was returned to the interrogation room the next day, *see id.*, ¶ 11; ECF No. 21-5, ¶¶ 27–29; ECF No. 20-13 at 5–6 (asserting Plaintiff was interrogated "[o]n days 23 and 24" of his captivity). *See Goodwin II*, 2025 WL 1040847, at *7–8. That is a far cry from the facts outlined in the cases discussed above.[2]

More recent FSIA torture cases, involving conduct and injuries similar to and even more serious than those here, have maintained the $10,000 per day framework. For example, in *Frost v. Islamic Republic of Iran*, a militant group backed by Iran abducted three U.S. nationals and held them in captivity for 31 days, during which time they were tortured. *See* No. 17-cv-603, 2019 WL 5110604, at *1 (D.D.C. Aug. 26, 2019), *special master's report and recommendation adopted in part, rejected in part on other grounds,* 419 F. Supp. 3d 112 (D.D.C. 2020). They were blindfolded and handcuffed around the ankles and driven to another location, where they were each put in to a small concrete cell, too small to stand up or lie down in; hogtied with their hands cuffed behind their backs and tied to their ankles and left in that position for days at a time; forced to eat off the floor; beaten; subjected to electric shocks; and interrogated while hung up by their feet or hands. *See id.* at *3, *5, *7. The court awarded each $330,000 in pain and suffering damages for the time spent in captivity. *See Frost*, 419 F. Supp. 3d at 115.

---

[2] Plaintiff also cites *Wyatt v. Syrian Arab Republic* in support of his request for increased pain and suffering damages. *See* ECF No. 21-1 at 34. There, Judge Lamberth found an award of pain and suffering damages using the $10,000 per day formula would be "inadequate to compensate [the] plaintiffs for the[] injuries" they suffered during their 21 days as hostages, where, although they "were not physically beaten during their captivity, . . . they were subjected to other forms of physical abuse: they were subjected to long marches at gunpoint through the biting cold of the Turkish wilderness and denied adequate shelter, clothing and food," and "subjected to a variety of psychological abuse, in-cluding repeated threats of death, being lined up for a simulated execution, being forbidden to speak with one another for several days, being forced to listen to anti-American PKK propaganda, and above all, being forced to endure the uncertainty of knowing whether they would live to see their families again." 908 F. Supp. 2d 216, 231–32 (internal citations omitted). The undersigned acknowledges that treatment is somewhat akin to the treatment Plaintiff suffered, it is nevertheless more severe, so the case does not counsel in favor of jettisoning the $10,000 per day standard here.

In *Saberi*, the plaintiff was imprisoned for 100 days in Iran's Evin Prison, where she was blindfolded; strip-searched; confined alone in a small, filthy cell; interrogated for hours at a time; and threatened with harm to herself and her family. 541 F. Supp. 3d at 74. In *Dawes v. Syrian Arab Republic*, the plaintiff was "locked . . . in a tiny, vermin-infested cell without heat or a toilet"; "regularly denied . . . medical care, food, water, and the ability to maintain basic hygiene"; "subjected . . . to systematic beatings and interrogation sessions"; and repeatedly "forced [] into incredibly painful positions that rendered him barely able to breathe or completely unable to sleep." No. 21-cv-2730, 2023 WL 8529288, at *5 (D.D.C. Dec. 8, 2023) (internal citations omitted). In *Rezaian*, the plaintiff was "arrested at gunpoint, held in unsanitary conditions and solitary confinement, threatened with death and dismemberment by interrogators trying to elicit a confession, and provided inadequate food and medical care." 422 F. Supp. 3d at 177. In *Hekmati*, the plaintiff remained imprisoned in Iran for over four years in deplorable conditions, and was subjected to "whippings," beatings, and psychological abuse. 278 F. Supp. 3d at 149. In each of those cases, the court assessed $10,000 per day as damages for pain and suffering while in captivity. *See Saberi*, 541 F. Supp. 3d at 82–83; *Dawes*, 2023 WL 8529288, at *10; *Rezaian*, 422 F. Supp. 3d at 180; *Hekmati*, 278 F. Supp. 3d at 151. Indeed, "[c]ourts have applied this formula in numerous cases, and they have done so largely irrespective of the amount of time that a given plaintiff was detained." *Dawes*, 2023 WL 8529288, at *10.

The undersigned sees no reason to depart in this case from the $10,000 per day formula given the similarity of Plaintiff's pain and suffering to that experienced by the victims in the above-cited cases.[3] Here, the $10,000 per day formula results in a pain and suffering damages calculation

---

[3] Indeed, the careful parsing of the treatment of a plaintiff to ensure that "individuals with similar injuries receive similar awards," *Hekmati*, 278 F. Supp. 3d at 163 (quoting *Moradi*, 77 F. Supp. 3d at 70), should assuage Plaintiff's concern that the use of this general approach is "mechanical," ECF No. 21-1 at 34.

of $630,000 for Plaintiffs' 63 days of captivity. Accordingly, the undersigned recommends awarding Plaintiff $630,000 to compensate for the pain and suffering he experienced during his detention in Syria.

> ### b.    Post-Captivity Pain and Suffering

Where, as here, a plaintiff's treatment during captivity results in continuing physical and/or psychological harm, "courts have found that the 'standard' per diem amount of damage[s] for the period of captivity does not adequately account for the long-term pain and suffering of the victim." *Frost*, 2019 WL 5110604, at *25; *see also, e.g.*, *Saberi*, 541 F. Supp. 3d at 83 ("While th[e] [$10,000 per day of captivity] award represents a reasonable estimate of pain and suffering damages for [the plaintiff's] time in confinement, it 'fails to account' for the pain and suffering that she has experienced following her release." (quoting *Stansell*, 217 F. Supp. 3d at 346)); *Rezaian*, 422 F. Supp. 3d at 180 (awarding, in addition to the $10,000 per day damages awarded for the plaintiff's time in captivity, a lump sum to account for post-detention pain and suffering); *Hekmati*, 278 F. Supp. 3d at 164 (same). In determining an award for post-detention pain and suffering, courts consider "the length and severity of the plaintiff's detention and torture, the extent of the plaintiff's lasting physical and mental injuries, and the estimated number of years that the plaintiff can be expected to suffer from these injuries." *Azadeh*, 2018 WL 4232913, at *19.

Plaintiff seeks $8.5 million in pain and suffering damages "for life post-captivity," asserting that is "a reasonable estimate of the pain and suffering [he] . . . will continue to experience as a result of Defendants' wrongful acts, and is consistent with other cases." ECF No. 21-1 at 36. Unfortunately, Plaintiff fails to identify which "other cases" that amount of damages is "consistent with," leaving the undersigned to do counsel's work. Plaintiff was 31 years old in 2019, the year he was abducted in Syria and released, meaning he was born in approximately 1988. *See* ECF No.

21-5, ¶ 1 (Plaintiff's declaration asserting in 2024 that he is 35 years old); *see also* ECF No. 21-17 at 10. According to the Life Tables published by the Centers for Disease Control, National Center for Health Statistics, the life expectancy of an individual born in 1988 is approximately 75 years, U.S. Dep't of Health & Hum. Servs., Nat'l Ctr. For Health Stats., Vital Statistics of the United States, 1988, Life Tables, Vol. II, Sec. 6, at 2 (Mar. 1991), https://www.cdc.gov/nchs/data/lifetables/life88_2acc.pdf [https://perma.cc/LH8C-XB27], so, at his release, Plaintiff faced approximately 44 years of the aftereffects of the trauma caused by his mistreatment. In *Doe A-1 v. Democratic People's Republic of Korea*, the court determined the baseline post-release pain and suffering award for a plaintiff who lived for 44 years after his detention was $8.8 million. *See* No. 18-cv-252, 2021 WL 723257, at *6 (D.D.C. Feb. 24, 2021) (plaintiff C-08); *see also Doe A-1 v. Democratic People's Republic of Korea*, 414 F. Supp. 3d 109, 120, 128 (D.D.C. 2019) (noting that the plaintiffs suffered "lasting psychological damage," such as post-traumatic stress disorder from their eleven months in captivity). In *Azadeh*, the court awarded the plaintiff, who suffered from "severe and permanent PTSD" and was expected to live for another 40 years, post-release pain and suffering damages of $8,888,889. 2018 WL 4232913, at *19–20. The undersigned finds those cases support Plaintiff's request for $8.5 million in post-release pain and suffering damages.

## 2. Economic Compensatory Damages

"As a general rule, lost earnings—past and future—are compensable economic damages" under the FSIA. *Abedini*, 422 F. Supp. 3d at 138 (citing *Moradi*, 77 F. Supp. 3d at 71 (citing Restatement (Second) of Torts § 906)). Traditionally, plaintiffs submit a forensic economist's expert report to establish economic losses. *See*, *e.g.*, *Roth*, 78 F. Supp. 3d at 402; *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 59–60 (D.D.C. 2018); *Valore*, 700 F. Supp. 2d at 83. When evaluating an expert's report related to lost future earnings, the Court must consider the

"reasonableness and foundation of the assumptions relied upon by the expert." *Roth*, 78 F. Supp. 3d at 402 (citing *Reed*, 845 F. Supp. 2d at 214).

Plaintiff has submitted an expert report calculating his lifetime loss of income caused by his abduction and confinement in Syria. *See* ECF No. 21-17. The report assumes that, in the absence of his abduction and confinement, he would have earned a Doctor of International Affairs degree in 2020, rather than four years later in 2024, thus delaying earnings based by four years. *See id.* at 5. It further assumes that Plaintiff's earnings would increase annually by 3.13 percent, "the 20-year average growth in average weekly earnings," according to the Economic Report of the President 2023. *Id.* at 6 & n.1. It calculates lost earnings based on six scenarios (the amounts below are all discounted to present value as reflected in the expert report):

(1) Plaintiff works in the U.S. until age 67, resulting in lost earnings of $815,807;

(2) Plaintiff works in the U.S. until age 70, resulting in lost earnings of $847,452;

(3) Plaintiff works in the U.S. until age 72, resulting in lost earnings of $868,162;

(4) Plaintiff works outside the U.S. until age 67, resulting in lost earnings of $907,384;

(5) Plaintiff works outside the U.S. until age 70, resulting in lost earnings of $938,275;

(6) Plaintiff works outside the U.S. until age 72, resulting in lost earnings of $968,713.

*Id.* at 10–11. A so-called "global premium" was applied to the non-U.S. calculations, apparently based on an assumption that Plaintiff would work in Singapore or somewhere similar. *See id.* at 5, 10. Using percentages from the Bureau of Labor Statistics' Employer's Cost of Employee Compensation, the report calculates the value of fringe benefits at 19.1 percent of wages and salaries. *See id.* at 6.

The assumptions underlying the report's damages estimates appear to be reasonable. Plaintiff graduated from college in 2015, *see id.* at 5, and in 2018, before he traveled to Syria, he was

working in Singapore in "investor relations."  ECF No. 21-5, ¶ 2.  When he returned from Syria, he "stayed with his parents in St. Louis before finally moving to D.C. in August 2022 to obtain a Doctor of International Affairs degree" and asserts that he would likely have started work on his degree earlier if not for his abduction.  ECF No. 21-1 at 37.

Plaintiff urges the Court to accept the highest number calculated in the expert report as his economic damages—that is, the number based on retirement at age 72 from a non-U.S. job, which, with the 19.1 percent fringe benefit rate, is $1,153,737.  *See id.*; *see also* ECF No. 21-17 at 4.  But he does so without explaining why that calculation is the most reasonable of the six provided.  His brief merely states: "A lost earnings expert quantified the loss in earning potential [Plaintiff] suffered as a result of th[e] delay [in earning his advanced degree or returning to the workforce], and estimated the loss at $1,153,737."  ECF No. 21-1 at 37.  To be sure, that is *one* of the estimates, but there are five others.  Neither Plaintiff's brief nor his declarations provide support for the assumption that he was reasonably likely to work for the rest of his career in Singapore or elsewhere outside the United States—other than perhaps the assertion that he worked in Singapore for a time after college and liked to travel, which is too thin a reed to support such a conclusion.  *See* ECF No. 20-7; ECF No. 25-1.  The undersigned therefore recommends that Plaintiff be awarded economic damages based on one of the three scenarios that assumes he works in the United States.

As to which of those three scenarios is most appropriate, Plaintiff again has a problem of proof.  He provides no support or argument for the assumption that he would work until the age of 72.  For the purposes of Social Security benefits, full retirement age for an individual born after 1960 is currently 67.  Social Security Retirement Age Calculator, https://www.ssa.gov/benefits/retirement/planner/ageincrease.html [https://perma.cc/J6UE-E69F].  Conforming to a number of cases from this District, in the absence of evidence that Plaintiff would likely work past his Social

Security retirement age, it is most reasonable to assume that he would work until the age of 67. *See, e.g.*, *Messina v. Syrian Arab Republic*, No. 20-cv-1237, 2024 WL 4199369, at *5–6 (D.D.C. Sept. 16, 2024) (basing a damages award for lost earnings on the assumption that the plaintiff "would work until his Social Security retirement age"); *Coombs v. Islamic Republic of Iran*, No. 19-cv-3363, 2023 WL 4894939, at *15 (D.D.C. July 5, 2023) (recommending adoption of "the calculation that applies the social security retirement as for the work life assumption [as] the most reasonable under the circumstances"), *special master's report and recommendation adopted*, 2023 WL 8651170 (D.D.C. Nov. 6, 2023); *Neiberger v. Islamic Republic of Iran*, No. 16-cv-2193, 2022 WL 17370239, at *14 (D.D.C. Sept. 8, 2022) ("Given '[c]urrent trends indicating that individuals are more likely to work beyond the average work life,' courts in this District have previously opted for the social security retirement age because it yields a later retirement age." (alteration in original) (quoting *Fritz v. Islamic Republic of Iran*, No. 15-cv-456, 2018 WL 5046229, at *17 (D.D.C. Aug. 13, 2018)), *report and recommendation adopted*, 2022 WL 17370160 (D.D.C. Sept. 30, 2022); *Azadeh*, 2018 WL 4232913, at *22 (basing an award of lost earnings on the assumption that the plaintiff would work until her "Social Security retirement age of 67"). Accordingly, the undersigned recommends awarding economic damages based on lost earnings of $815,807. *See* ECF No. 21-17 at 11 (scenario assuming the plaintiff works in United States until age 67). The value of lost fringe benefits on that amount (rounded to a whole number) is $155,003 (19.1% of $815,807). Thus, the total amount of economic damages that should be awarded is $970,810 ($815,807 + $155,003).

### 3. Punitive Damages

Plaintiff seeks a punitive damages award of $22,307,474, twice the requested amount of compensatory damages. ECF No. 21-1 at 38. "Punitive damages are not meant to compensate the

victim, but instead meant to award the victim an amount of money that will punish outrageous behavior and deter such outrageous conduct in the future." *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 56 (D.D.C. 2012). "Four factors are relevant in deciding the level of punitive damages appropriate in a given case: '(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants.'" *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 75 (D.D.C. 2021) (quoting *Est. of Steinberg v. Islamic Republic of Iran*, No. 17-cv-1910, 2019 WL 6117722, at *9 (D.D.C. Nov. 18, 2019)).

Here, each of those factors counsels in favor of awarding punitive damages. Torture itself is appalling, and here it caused significant psychological suffering to the Plaintiff. Plaintiff's detention and torture, resulting in lasting injury to him, warrant deterrence, as cases in this District indicate. *See Kim*, 87 F. Supp. 3d at 291 ("The abduction and presumed torture by North Korea of missionaries seeking to aid refugees warrants significant deterrence."); *Wyatt*, 908 F. Supp. 2d at 233 ("The brutal character of the kidnapping in this case, the significant harm it caused both the hostage plaintiffs and their families . . . all merit an award of punitive damages."). Finally, Syria, "as [a] state actor[], can be presumed to possess significant wealth." *Christie v. Islamic Republic of Iran*, No. 19-cv-1289, 2020 WL 3606273, at *21 (D.D.C. July 2, 2020).

There are several potential methods to calculate punitive damages in FSIA cases. "The first is to 'multiply the foreign state's annual expenditures on terrorism by a factor between three and five.'" *Selig*, 573 F. Supp. 3d at 75 (quoting *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 87 (D.D.C. 2017)). A second method is to award each plaintiff $150 million. *See, e.g.*, *Levinson v. Islamic Republic of Iran*, No. 17-cv-511, 2020 WL 5834839, at *2 (D.D.C. Oct. 1, 2020). "Third, some courts in this district have calculated the total compensatory damages

awarded for a victim and then multiplied that award 'by a factor between one and five.'" *Selig*, 573 F. Supp. 3d at 76 (quoting *Fritz*, 324 F. Supp. 3d at 65).

Plaintiffs do not request that the Court apply the first approach, nor do they provide an estimate of Syria's wealth or its annual expenditures on terrorism. The undersigned therefore "declines to [recommend] the first approach." *Id.* at 76. Likewise, the undersigned will not recommend a flat $150 million in punitive damages. "As this Court and others have explained, . . . the $150 million figure is most appropriate in cases where the victim of terrorism has died" in the attack. *Alinejad v. Islamic Republic of Iran*, No. 19-cv-3599, 2023 WL 4684929, at *26 (D.D.C. July 6, 2023); *see also Saberi*, 541 F. Supp. 3d at 87 (rejecting the $150 million lump sum approach in case involving surviving detainee because "that method 'is more typically employed when similar conduct has never been litigated or in cases of terrorist attacks more deadly than what happened here'" (quoting *Frost*, 419 F. Supp. 3d at 117); *Doe A-1*, 2021 WL 723257, at *10 (similar); *Doe*, 2020 WL 5422844, at *17 (rejecting the $150 million lump sum approach because it "is typically used in cases where, unlike here, at least one of the plaintiffs dies"). The undersigned declines to recommend awarding Plaintiffs $150 million in punitive damages.

Plaintiffs urge the Court to use the third method—using a multiplier of compensatory damages to calculate punitive damages—and award double the amount of compensatory damages in punitive damages. ECF No. 21-1 at 38. Cases using a multiplier of greater than one to calculate punitive damages tend to involve large-scale terrorist attacks (or series of attacks) resulting in numerous deaths. For example, *Karcher v. Islamic Republic of Iran* was a case filed by over 300 plaintiffs concerning scores of "attacks on U.S. Servicemembers and others in Iraq from 2004 through 2011" facilitated by Iran and employing "explosively formed penetrator[s] . . . that caused exceptional damage to armored personnel carriers and their occupants." 396 F. Supp. 3d 12, 14

(D.D.C. 2019). There, Judge Kollar-Kotelly found appropriate a punitive damages award of three times the compensatory damages award. *See Karcher v. Islamic Republic of Iran*, No. 16-cv-232, 2025 WL 561261, at *4 (D.D.C. Feb. 20, 2025). In doing so, she noted that calculating punitive damages using a multiplier had been used in similar cases. *See id.* at *3–4. With one exception, each of the cases she cited or discussed using the multiplier method involved one or more terrorist attacks resulting in multiple deaths. *See* Memorandum Opinion at 1, 8, *Lee v. Islamic Republic of Iran*, No. 19-cv-830 (D.D.C. July 31, 2024), ECF No. 145 (using a multiplier of two in a case involving 99 attacks against U.S. military personnel between 2004 and 2011 resulting in multiple deaths); *Stearns v. Islamic Republic of Iran*, No. 17-cv-131, 2023 WL 4999215, at *1, *4 (D.D.C. Aug. 4, 2023) (using a multiplier of three in a case involving "a series of attacks using explosively formed penetrators" that killed multiple people); *Force v. Islamic Republic of Iran*, 617 F. Supp. 3d 20, 29, 41 (D.D.C. 2022) (using a multiplier of two in a case involving a series of attacks in Israel resulting in multiple deaths); *Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 31, 50–51 (D.D.C. 2012) (using a multiplier of three in a case involving the bombing of the U.S.S. Cole resulting in multiple deaths), *judgment vacated on other grounds in light of Republic of Sudan v. Harrison*, 587 U.S. 1 (2019).[4] The conduct at issue here—the (albeit heinous) torture of a single individual—is unlike that addressed in those cases, and does not, therefore counsel in favor of a multiplier greater than one. Indeed, Judge Mehta recognized in *Lee* that "[a] multiplier of one is applied in cases involving torture but not death." *See* Memorandum Opinion at 7, *Lee v. Islamic Republic of Iran*, No. 19-cv-830 (D.D.C. July 31, 2024), ECF No. 145; *see also Gidada v. Islamic*

---

[4] The outlier is *Gill v. Islamic Republic of Iran*, which involved a single attack that resulted in no deaths and only one known injury. 249 F. Supp. 3d 88, 105 (D.D.C. 2017). Judge Kollar-Kotelly also cited *Opati v. Republic of Sudan*, a case involving the attacks on U.S. embassies in Nairobi and Dar es Salaam resulting in hundreds of fatalities that assessed punitive damages in an amount equal to compensatory damages. *See* 60 F. Supp. 3d 68, 72, 82 (D.D.C. 2014). That, however, resulted in a punitive damages award of over $1.5 billion, which perhaps explains the court's refusal to use a multiplier greater than one. *See* Order at 7, *Opati v. Republic of Sudan*, No. 12-cv-1224 (D.D.C. July 25, 2014), ECF No. 44.

*Republic of Iran*, No. 21-cv-2338, 2024 WL 3741438, at *4 (D.D.C. July 1, 2024) (noting that, "[i]n cases in which no one has died, . . . the individual victims have been subjected to significant periods of confinement," and no "exacerbating factors" are present, courts have "found that a multiplier of one [i]s appropriate").  Several cases involving a surviving victim of torture or hostage-taking bear that out.  *See, e.g.*, *Est. of Fakhoury v. Islamic Republic of Iran*, No. 21-cv-1218, 2025 WL 1262297, at *8 (D.D.C. May 1, 2025); *Dawes*, 2023 WL 8529288, at *14; *Saberi*, 541 F. Supp. 3d at 87; *Abedini*, 422 F. Supp. 3d at 142; *Azadeh*, 2018 WL 4232913, at *23; *Hekmati*, 278 F. Supp. 3d at 167; *Moradi*, 77 F. Supp. 3d at 73.  Accordingly, the undersigned recommends assessing punitive damages in an amount equal to compensatory damages.

## IV.    RECOMMENDATION

For the reasons stated above, the undersigned **RECOMMENDS** that the Plaintiff be awarded damages in the amounts specified in the table below.

| Summary of Damages | |
|---|---:|
| Pain and Suffering During Captivity | $630,000 |
| | |
| Pain and Suffering After Captivity | $8,500,000 |
| | |
| Total Pain and Suffering Damages | $9,130,000 |
| | |
| Economic Damages | $970,810 |
| | |
| **Total Compensatory Damages** | **$10,100,810** |
| | |
| **Punitive Damages** | **$10,100,810** |
| | |
| **Total Damage Award** | **$20,201,620** |

\*        \*        \*        \*        \*

The parties are hereby advised that under the provisions of Local Rule 72.3(b) of the United States District Court for the District of Columbia, any party who objects to the Report and Recommendation must file a written objection thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the report and/or recommendation to which objection is made, and the basis for such objections. The parties are further advised that failure to file timely objections to the findings and recommendations set forth in this report may waive their right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985).

G. Michael Harvey

Date: May 15, 2025

G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE

28